M. W. ENGLEMAN, as Assignee for the Benefit of Creditors Generally of Campagnola Food Products, Inc., a Corporation, Appellant,

v.

GENERAL ACCIDENT, FIRE & LIFE ASSURANCE CORPORATION and Insurance Company of North America, a Corporation, Appellees.

No. 15315.

United States Court of Appeals
Ninth Circuit.

Dec. 9, 1957.

As Modified on Denial of Rehearing
March 10, 1958.

Harry J. Miller, Robert Haves, Beverly Hills, Cal., for appellant.

Hindman & Davis, Los Angeles, Cal., for appellee.

Before ORR, CHAMBERS and BARNES, Circuit Judges.

BARNES, Circuit Judge.

This is a diversity case. (28 U.S.C.A. § 1332.) It raises the question of how much appellees are obligated to pay because of a loss incurred by appellant as a result of a fire on August 7, 1954, which destroyed certain personal property owned by appellant's assignors. The personal property had been insured on May 10, 1952, in the amount of $11,000 with defendant-appellee General Accident Fire and Life Assurance Corporation, Limited, a corporation, (hereinafter called General) and in the amount of $12,000 with defendant-appellee Insurance Company of North America, a corporation (hereinafter called North American). These sums each company was willing to and did pay to appellant. The latter sought to recover an additional $14,000 from General and $15,000 from North American, by this suit for declaratory relief to establish the additional liability and for payment of the additional sums. Such additional sums were due appellant if he could prove an alleged oral contract binding defendants to the additional fire insurance coverage as of August 2, 1954, or as of any subsequent time during the five days thereafter before the fire occurred.

■ The law of California is applicable, since all transactions occurred and were to be performed within that state. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

After plaintiff submitted his evidence, defendants moved for a directed verdict. The trial court properly treated this as a motion for dismissal under Fed.Rules Civ.Proc. § 41(b), 28 U.S.C.A., and granted the motion.

The purported oral contract of August 2, 1954, relied upon by plaintiff, allegedly had been entered into by and between the President of the insured, a Mr. Esposito, and one Love, an insurance agent. Love had once been a "general agent" for General, but was not such at the time of the alleged oral contract, nor had he been for many months. He had never been an agent for North American. Love shared his office, and the expenses thereof, with one Klee, who at all times mentioned had been a general agent for both General and North American. Before August 2, 1954, the outstanding policies had been renewed by Love by use of and through Klee's accounts, as had other policies for other customers of Love. Both defendants had accepted insurance written by Love for other customers, and submitted to them through Klee's agency account, and with Klee's acquiescence.

■ In reviewing the propriety of the trial court's determination, appellant is entitled to the benefit of every inference which can be reasonably drawn from the evidence when viewed in the light most favorable to him. Kingston v. McGrath, 9 Cir., 1956, 232 F.2d 495, 54 A.L.R.2d 267; 2 Barron & Holtzoff, Federal Practice and Procedure, § 919; 5 Moore's Federal Practice 231.

Esposito and Love for many months had discussed the advisability of increasing the coverage. Love testified that on July 30, 1954, Esposito told him by telephone, "in essence" to "go ahead and place that $50,000 of fire insurance which we discussed some time ago." *Love's reply does not appear in the record.*[1] Love prepared, on August 1st,

---

[1] Love was not asked on direct examination what his reply was to Esposito. He was asked whether he placed the additional coverage, and he answered, "I did." On cross-examination, Love stated he did not tell Esposito he could, or did, bind either defendant [Tr. 172]. He never told Esposito he was insured with either company [Tr. 172].

"Q. You stated to him that you would immediately make application to insurance companies to see if you could place the business, didn't you, *or something to that effect?* A. *Something in that vein,* yes." [Emphasis added.] [Tr. 174.]

Love testified he had never held out to anyone he had authority to bind General, after the cancellation in 1952 of his agency contract. Love never mentioned the name of any company in speaking to Mr. Esposito.

1954 (Sunday evening), two memoranda addressed to General and North American. They appear in the margin of this opinion.[2]

The memos were apparently mailed on the early morning of August 2, 1954, to the respective companies, although mistakenly dated August 3, 1954.

Love testified, as an expert witness, that the custom of the trade[3] determined the amount of premium (the same in all companies, and at the same rate as the existing policies); the effective date (the date of the memo); the property insured (the same as that described in the existing policies). The witness also testified that the custom "varied between any number of companies," that he couldn't say what the custom of the trade was with these particular companies involved, but only as to the custom in general.

> "The custom and practice in the insurance trade in a general manner is that when an insurance company has a request for any type of coverage they do not desire or positively will not issue, that they at once notify you with a telephone call, followed by a written letter of declination."

Love had no actual communication from either defendant between August 2nd, 1954 (date of the mailing) and August 7th, 1954 (the date of the fire). However, an employee of North American had endeavored to reach Love by telephone, once on August 4th or 5th, and twice on August 6th. Each time, Love was out, and on three occasions, Love returned the call, but the caller was out.

Both parties agree that contracts of insurance can be created orally in California. Appellant urges that all necessary terms can be supplied by the custom of the trade; including the acquiescence to be bound, by a company's failure to immediately refuse the proffered offer. Appellees urge that there was never a meeting of the minds; that while oral contracts of insurance are recognized in the state of California, the terms of this alleged oral contract were never supplied, and it never came into existence as a contract; that the memoranda sent by Love were mere inquiries; that the custom of the trade may supply or interpret the terms of a contract, but cannot be used to create a contract. If appellees are correct in their contention that an oral contract cannot be *created* by the custom of the trade, that is dispositive of this appeal. We need not then consider whether there was sufficient evidence of the custom of the trade to establish the contract in all its essential details. On the other hand, if we conclude that an oral contract can be *created* by the custom of the trade (rather than having uncertainties in it supplied), as appellant maintains, then we have the problem of whether, as a matter of law, there was sufficient evidence of that custom in the record to go to the jury on the question of fact as to the existence of such a contract.

It is clear that there was no direct acceptance by the companies of the increas-

2. Plaintiff's Exhibit No. 4:
>  "Love Insurance Agency
>  510 W. Sixth Street
>  Los Angeles 14, California
To: Gen. Acc.
Subject: Campagnola No. 784651.
Attention:
Date: 8-3-54.
>  Will you increase your line by endorsement to $25,000 part of total line of $88,000. Advise immediately.
>  Dick Love."
Plaintiff's Exhibit No. 5:
>  "Love Insurance Agency
>  510 W. Sixth Street
>  Los Angeles 14, California

To: Ins. Co. North Am.
Subject: Campagnola No. 61296
Attention: Fire Und.
Date: 8-3-54.
>  Will you endorse to increase your line to $27,000, part of total line of $88,000. Advise immediately.
>  K. H. Klee."
The $88,000 figure mentioned includes a third insurance policy of $36,000 with a company not here involved. Note that one memorandum is signed by Love's name, the other by Klee's.

3. Cf. Insurance Code, § 335(b).

ed risk. Can the lack of proof of action on the part of the appellees between the date of their respective receipts of the memoranda in evidence (Plaintiff's Exhibits 4 and 5), and the fire, constitute an acceptance by the custom of the trade in the Los Angeles area?

We cannot agree with appellant that the amount of time the appellees had to answer the memo was *five* days. Appellant computes from the time of alleged *mailing*, i. e., August 2, 1954.

Under California Code law, the time of any notice is computed by excluding the day of the act of service thereof, or first day, and including the last.[4] This would be five days. But this rule does not apply to acts of service accomplished by mailing. Where service is by mail, and both parties have offices in the same city, time to do an act is extended one day. Montgomery v. Norman, 1953, 120 Cal.App.2d 855, 262 P.2d 360. Does this one day extension apply to "a reasonable time" within which an act must be done? How does one add one day to "a reasonable time"? We note that under the Federal Rules of Civil Procedure, Rule 6(e), and the Federal Rules of Criminal Procedure, Rule 45(e), 18 U.S.C.A., (although they are inapplicable here) when a notice is mailed, three additional days are granted within which to do any act. The Rule of Section 10 of the California Civil Code is also predicated upon the last day of the five not being a holiday.

The time of the notice here given was uncertain, and undisclosed with any certainty by the evidence. Should the jury have speculated on how long the mail delivery took, and the purpose of the attempted telephone calls to Love from the companies, and whether insurance companies, like banks, were entitled to consider Saturday a holiday? There was no evidence that letters mailed on one day would be delivered that same day, nor how long such delivery would take.[5] There was no evidence respecting whether or not the 7th, a Saturday, was a day on which these particular insurance companies, or any insurance companies in this area, were or were not open for business.

There is no question but that California law recognizes the validity of oral contracts of insurance, Toth v. Metropolitan Life Ins. Co., 123 Cal.App. 185, 188, 11 P.2d 94, and each party to a contract of insurance is bound to know "All the general usages of trade," California Insurance Code, § 355(b), and "the persons carrying on that trade are deemed to have contracted in reference to that usage, unless the contrary appears; and the usage forms a part of the contract." Guipre v. Kurt Hitke & Co., 109 Cal.App. 2d 7, 240 P.2d 312, 316–317.

But this does not mean that usage or custom of the trade can bring an insurance contract into existence initially, without some act of acceptance of the proposed offer having been made by the company, or someone in authority acting on its behalf. The act of acceptance may be express or implied. There was here no express acceptance of the additional risk.[6] The acceptance is implied by appellant from the lack of declination. Mr. Love's testimony was the only testimony as to custom. It is that the custom was that if the applications (memoranda) were to be rejected, it was to be done "at once." This obviously calls for a definition of what is meant by "at once." We conclude that this can only mean that the defendants have a reasonable time within which to accept or decline the cov-

---

4. California Civil Code, § 10. Cf. also California Civil Code, § 3266c, as to negotiable instruments, and California Civil Code, § 9.1, as to banks, and California Gov.Code, § 6702, as to public offices of the State and political divisions thereof.

5. Because the case was taken from the jury at the conclusion of the plaintiff's case, the defendant put on no evidence.

In his opening statement to the jury, counsel for appellees stated the date of receipt of the memos was August 4th for General and August 5th for North American.

6. See Note 1. Love's conclusion that he placed the additional coverage is disproved by his testimony as to what actually had been said.

erage. This is a question of fact, and should be decided by the jury, *provided* there is some factual basis upon which the jury · could come to a conclusion. There was no evidence introduced as to what this reasonable time is or should be, in accordance with any custom or usage of the trade. Unlike some questions of fact, wherein the jury from their own experience as ordinary men and women, could determine what constitutes "a reasonable time," here there is involved a highly technical field of specialized business activity. Can we say the jury should be permitted to speculate or conjecture as to what would be a reasonable time within the insurance industry?

Appellant relies largely on Parlier Fruit Co. v. Fireman's Fund Ins. Co., 1957, 151 Cal.App.2d 6, 311 P.2d 62, 69, describing that case as having "similar facts." With this we cannot agree. But because it is so largely relied upon by appellants, we feel it should be discussed in some detail.

In Parlier, Babish (who there acted the part Love did here) was *employed* by Rebholtz, "a general agent for all the defendants," and was "as such *authorized to issue binders and cover notes on said companies.*" Babish told the insured eight days before the fire *"that he would bind"* the companies, in the agreed amount of $100,000. Babish *"told Vito* (representing the plaintiff company) *that plaintiff was covered ✶ ✶ ✶* for $75,000 and Vito stated that was sufficient." One company, Planet Insurance Co., *issued a "daily,"* endorsed "Bound for $7,500," before the fire. (The fire occurred on July 31st.) Another company, Pacific National Fire Ins. Co., not a defendant in the Parlier case, telephoned Babish prior to the fire that it would not accept the coverage. Home Fire and Marine Insurance Co. left a message on the date of the fire it could not accept coverage. This was received by Babish on August 1st, after the fire. On July 29th, the Insurance Company of North America accepted $10,000 in coverage. On August 1st, after the fire, Scottish Union and National Ins. Co. wrote that it was bound for $10,000. On August 4th, (after the fire) Boston Insurance Company wrote that it could not accept an additional $10,000 over its original $12,500.

The California Appellate Court says:

"In connection with the court's finding that Rebholtz had authority to bind defendants by an oral coverage and that Babish was authorized to represent both Rebholtz and defendants in this respect, defendants contend that Babish had no authority to bind them, claiming that he was merely a solicitor and not their agent, and that a solicitor may not bind an insurance company. See Browne v. Commercial Union Assur. Co., 30 Cal.App. 547, 554, 158 P. 765. This contention overlooks the fact that Rebholtz was the general agent of defendants with full power to bind them, and that Babish was the representative of Rebholtz authorized to act for Rebholtz. Moreover, the defendants acknowledged Babish's right to act for Rebholtz when they respectively answered his request for coverage by agreeing to the coverages above mentioned." 311 P.2d 62, at page 70.

The California court then discusses the two forms of insurance policies ordinarily dealt with by the courts:

(1) *The preliminary contract,* sometimes called "cover note" or "binder," intended to protect the applicant pending investigation of the risk by the company or until the policy can be properly issued.

(2) *The final contract* or policy itself.

The California court continues (311 P. 2d 62, at page 71):

"A valid temporary or preliminary contract of present insurance may be made orally, or it may be partly in parol and partly in writing ✶ ✶ ✶. Even where such express language is not employed, the contract is construed as being subject to the terms and conditions of the policy to be issued or of the policy ordinarily used by the company, or, if there is a standard policy in the jurisdiction,

according to the terms and conditions of that policy, and it is presumed that the parties contemplated such a policy, containing such conditions and limitations. * * * The intention of the parties is the fundamental issue in interpreting a binding receipt issued by insurer at the time of the application for the policy, and where such a receipt is clearly established as a temporary contract of insurance it is favorably regarded by the courts. * * * It is a common practice pending delivery of a policy to issue to the person contracting for fire insurance some sort of a receipt or memorandum, which is sometimes called a 'binding slip,' evidencing the making of the contract, and such memorandum is evidence of a present contract of insurance, affording temporary protection to the applicant pending the issuance of a policy, or consideration of the application and its acceptance or rejection. 44 C.J.S. Insurance § 230, pp. 958, 959, 960, 964.

"With these rules of construction in mind, let us examine the contract here. It is clear that Babish, certain of the defendants and Vito believed that plaintiff was temporarily covered by use and occupancy insurance until the exact terms of a policy could be worked out. Certainly those defendants knew what they had in mind when they considered themselves bound for a particular sum for use and occupancy insurance. No one concerned doubted that the coverage had taken immediate effect. Had there been no fire, plaintiff would have had to pay defendants for premiums for that coverage in the event that no policy was ultimately issued. If issued, the premiums would have related back to the date when Babish told Vito plaintiff was covered. The policy must be 'specific, either by express terms or by implication, as to the subject matter, period, rate, and amount of insurance.' 44 C.J.S. Insurance § 230, p. 963." Parlier Fruit Co. v. Fireman's Fund Insurance Co., supra, 311 P.2d at page 71.

In discussing the cases here urged by appellant,[7] the California court in Parlier differentiates American Can Co. v. Agricultural Ins. Co., 12 Cal.App. 133, 135, 106 P. 720, 721, saying,

"* * * the facts are entirely different from those in our case, *including the fact that no binder was made* * * *,"

(emphasis added) and the court said:

"'A parol contract of insurance may be made and is enforceable; but as such contracts are rarely

---

7. Appellant has submitted additional authority subsequent to oral argument. Wood v. Gunther, 89 Cal.App.2d 718, a partnership case, is cited by him, with particular emphasis on pages 730 and 731, 201 P.2d 874, at pages 881 and 882.

There the court said:

"The law does not permit one to play fast and loose in situations *where one owes a duty to another*. This is not the case of a stranger offering to buy her interest, whatever it may have been in the partnership, for $45,000. *To such a person she would owe no duty to speak at all*, but in this case she was one of three fiduciary partners in a firm of persons, who had a contract with one another, under which they owed duties, one to the other; and, *consequently,* silence made the acceptance. * * * Conduct which imparts acceptance or assent is acceptance or assent, in the view of the law * * * 'One who keeps silent, *knowing that his silence will be misinterpreted,* should not be allowed to deny the natural interpretation of his contract.'" [Emphasis added.]

In McAulay v. Jones, 1952, 110 Cal. App.2d 302, 242 P.2d 650, a landlord and tenant case, "with considerable of a partnership relationship included," (110 Cal.App.2d at page 306, 242 P.2d at page 652) the court follows Wood v. Gunther, supra, and cases therein relied on for the proposition that *"where there is a duty to speak an offer may be accepted by silence."* [Emphasis added.] But see Leslie v. Brown Brothers, infra.

A casual reading of these cases, particularly with emphasis on the emphasized portions, shows they are not apposite to the factual situation in the instant case.

made, and are not made in the usual and ordinary course of business, the proof of such oral contract must be clear and convincing.' Law v. Northern Assurance Co., 1913, 165 Cal. 394, 400–401, 132 P. 590, is to the same effect. While it may have been true that in 1909 and 1913, parol contracts of insurance were rarely made, such statement is no longer true. Oral binders are now a common and necessary part of the insurance business. The evidence here is clear and convincing as there is no contradiction of the testimony of Vito and Babish upon the subject of the coverage. Gandelman v. Mercantile Ins. Co. of America, 9 Cir., 187 F.2d 654, is not in point as the court held that the alleged agent of the insurance company had no authority to bind the companies. The court stated that at the time the agent told the plaintiff ' "You are covered" ' he was 'not acting specifically in behalf of appellees here and his answer obviously did not purport to bind these appellees. * * *' At page 656. Western Indemnity Co. v. Industrial Acc. Comm., 182 Cal. 709, 190 P. 27, is not in point for the reason that it was held that there was no evidence showing that the agent of the insurance company had authority to bind it by parol. The same is true of Cranston v. California Ins. Co., 1919, 94 Or. 369, 185 P. 292." Parlier Fruit Co. v. Fireman's Fund Insurance Co., supra, 311 P.2d at page 74.

The Parlier case recognizes that there is, and should be, a difference in these cases where there is (a) an existing preliminary binder accepted, and a subsequent uncommunicated notice of withdrawal from the coverage (Lumberman's Mut. Ins. Co. v. Slide Rule & Scale Eng. Co., 7 Cir., 177 F.2d 305); and (b) "where an application for insurance is made, [then] silence or delay by the company in acting on it does not result in a contract, nor does the rejection of the application by the company have to be communicated to the applicant [Lucas v. Metropolitan Life Ins. Co., 14 Cal.App.2d 676, 58 P.2d 934]."

Such latter type of cases, says the California court in Parlier, are not in point. In the instant case the factual situation makes them in point, and controlling.

C.J.S. states it this way (Vol. 44 Insurance § 230, p. 961):

"Some agreements of this nature are construed to effect insurance from the specified date unless the company rejects the application; and under this view a rejection of the application after loss is too late to relieve the company of liability, at least where the rejection is on the sole ground that a loss has occurred. However, other agreements are construed not to effect insurance from the specified date until the company acts on the application by accepting or rejecting it, but merely to be agreements that, if the company regards the risk desirable, it will issue a policy to the applicant relating back to, and taking effect from, the specified date; and under this view the company cannot be held liable merely on account of its delay in acting on the application until after a loss has occurred, at least where the application is such that no well managed insurance company in the ordinary course of its business would have accepted it, but it seems that the rule is otherwise where the company would have accepted the application had it acted within a reasonable time and before the loss."

In Lucas v. Metropolitan Life Ins. Co., supra [14 Cal.App.2d 676, 58 P.2d 936], the California court flatly states that "mere delay in acting on an application does not create a contract of insurance." It cites in support of that statement Stewart v. Helvetia Swiss Fire Ins. Co., 102 Cal. 218, 219, 220, 30 P. 410 (where the offer was never communicated to the company until after the loss); Leslie v. Brown Brothers, 208 Cal. 606, 621, 283

P. 936 (a non-insurance case) ; and, Giddings v. Northwestern Mutual Life Ins. Co., 102 U.S. 108, 111, 26 L.Ed. 92. Here the Supreme Court said with respect to a policy of life insurance:

> "The presentment of the application to the agents at Chicago, its transmission to Milwaukee, and its receipt by the company, in nowise committed or bound the latter to anything. It was competent for the company to pause as long as they might deem proper, and finally to accept or reject the application as they might choose to do. If they elected to contract, they had the right to prescribe the terms, and it was for the other party to assent to or reject them. His unbroken silence, as would have been such silence by the company after receiving the application, was necessarily negation. Neither party in such case would have been bound in any wise to the other, because there would have been wanting the mutual assent of the minds of the parties, which is vital in all cases to the creation of a contract obligation. What was done, without something further, could have no more weight or efficacy, in the view of the law, than an unexpressed thought or any other unexecuted intention."

This Lucas decision was denied a hearing by the California Supreme Court.

We take it to be the settled law of California that there must be some clear and convincing evidence of an oral binder, or acceptance by someone in authority acting on behalf of the insurance company sought to be held, before there can be any question of the *creation* of a contract to go to a jury for its determination. Were any other rule applicable, conjecture and surmise on the part of the jury would establish and create legal and binding contracts of insurance. Here there was sufficient evidence to make agency a question of fact for the jury, but no sufficient evidence, and, in fact, no evidence of any affirmative act of acceptance on the part of the defendant sought to be held, either (a) through evidence of some fact or act, or (b) through evidence of the custom established in the business community. Hence we must and do affirm.